L. J. Van Gilder

*v.*

The City of Morgantown, *a Municipal Corporation*

(CC 746)

Submitted April 12, 1949. Decided May 24, 1949.

Dissenting Opinion, February, 1952.

Lovins and Haymond, Judges, dissenting.

*Ezra E. Hamstead, Hale J. Posten,* for plaintiff.

*H. William Largent,* for defendant.

Kenna, Judge:

This action of trespass on the case in assumpsit was brought in the Circuit Court of Monongalia County by L. J. Van Gilder against the City of Morgantown, seeking a recovery of the value of an airplane destroyed by fire in a hangar at the municipal airport of that city. The alleged cause of action is based upon the breach of a contract of bailment for hire pursuant to which the plaintiff-

bailor paid to the City of Morgantown as bailee a monthly rental of fifteen dollars that entitled him to store and keep his airplane in the defendant's custody at its airport. The declaration alleges that due to the improper care of the bailee the property of the bailor was wholly destroyed so that it was not and could not be returned to the bailor upon demand, resulting in the promises and undertakings of the bailee being violated to the damage of the plaintiff-bailor in the sum of $5,000.00.

The defendant appeared and filed its written demurrer to the plaintiff's declaration which was overruled. Thereupon the defendant filed a pleading captioned "PLEA AND STATEMENT OF DEFENSE NUMBER 1", the plaintiff's demurrer to which was overruled, and upon the joint application of the parties the Circuit Court of Monongalia County certified to this Court the following questions:

"1. Does the declaration state a good cause of action?

"2. Under the facts set forth in the declaration and defendant's plea Number 1 is the defendant operating the Morgantown Municipal Airport in a governmental or in a proprietary capacity?

"3. Does the special plea and statement of defense Number 1 show a joint operation of the Morgantown Municipal Airport by the defendant and the State of West Virginia within the purview of Section 10, Article 2A, Chapter 29, of the Code of West Virginia, to such an extent as to afford the City of Morgantown immunity from this action?"

Before considering the questions of law which in our opinion arise upon this certification we believe it might be well to quote in part the wording of Code, 58-5-2, being the section that governs certifications to this Court. It reads as follows:

"Any question arising upon the sufficiency of a summons or return of service, or challenge of the sufficiency of a pleading, in any case within the appellate jurisdiction of the supreme court of

appeals, may, * * * be certified by it to the supreme court of appeals for its decision, and further proceedings in the case stayed until such question shall have been decided and the decision thereof certified back."

It will be at once observed that the second question certified is based upon the composite allegations of fact in the declaration and the defendant's plea No. 1. The statute does not contemplate certifications of a hybrid nature, but is confined to a "question arising upon the sufficiency of a summons or return of service, or challenge of the sufficiency of a pleading * * *." Furthermore, the statute requires that upon certification the further proceedings in the case be stayed until the decision is certified back, thus indicating that the accumulation of questions arising during the course of pending litigation is not proper matter of certification in a lump, but that certification applies only to each step undertaken and to questions arising separately upon each particular pleading, and is intended to apply only to questions concerning which the trial judge entertained serious doubt.

Considering the first question certified as to the sufficiency of the declaration, its allegations are that on the 20th day of August, 1947, the City of Morgantown was engaged in the business of operating for hire and reward a public airport and facilities incident thereto, and that in the course of such business the City of Morgantown violated its contract of bailment for hire with the plaintiff. In all strictness, the questions that arise upon demurrer are confined to the sufficiency of the declaration's allegations of a contract of bailment and its breach. We are of the opinion that it does allege sufficiently a contract of bailment between the plaintiff and the defendant, the City of Morgantown. The declaration alleges that the defendant, while engaged in the business of operating an airport for profit, was paid for the care and custody of the plaintiff's airplane when not in use by him or by persons thereunto duly authorized and that by reason of the improper care thereof by the defendant it was destroyed, to the damage of the plaintiff. This we believe is sufficient.

*McClain* v. *West Virginia Automobile Co.,* 72 W. Va. 738, 79 S. E. 731; 6 Am. Jur. 25.

Although the question that follows, in utter strictness, does not properly arise upon demurrer, since the allegations of the declaration alone fairly present it, we believe may be properly discussed. The question is: Can the City of Morgantown be sued for anything done by it in the operation of an airport, or, phrased differently, is the operation of an airport on the part of a municipality the performance of a governmental or of a proprietary function? In our opinion a municipality engaged in the operation of an airport is necessarily, under our present statutes, performing a governmental function. We believe that our Legislature, by unavoidable inference, has so provided.

By Chapter 12 of the Acts of 1947 [Code (Michie, 1947 Supp.) 29-2A-1-28] the Legislature rewrote, in large measure, if not entirely, the West Virginia statutes relating to aeronautics. We are not here concerned with the entire provisions of that act, which was in effect at the time of the injury complained of here, therefore we shall refer only to its provisions which we believe do affect the decision of this case.

The 1947 act repealed the statute creating the "West Virginia State Board of Aeronautics" enacted as Chapter 4 of the Acts of 1931, and in its stead formed and defined the powers of "The West Virginia State Aeronautics Commission" to be composed of five members appointed by the Governor in the manner provided by the act. The commission, as an arm of the State Government, is vested with authority to control aviation on a state wide basis, one of the express provisions of Section 3 of the act reading as follows:

> "* * * The commission shall have general supervision and control over all airports used for commercial purposes, all state and municipal airports, all air schools, and over all phases of aeronautics within this state. * * *."

It was the evident intention of the Legislature to place the control of the operation of all airports and the administration of their affairs within the powers granted the commission. The commission was granted not only joint, but paramount, control of the active operation of all airports within the State, no matter what the ownership or classification. In the sense of *equal* power the provisions of the act preclude the State from operating an airport "jointly" with another person. Absolute control is asserted by the State, through the commission, as the exercise of its police power. *State ex rel. Board of Aeronautics* v. *Sims,* 129 W. Va. 694, 41 S. E. 2d 506.

It appearing that airports are operated under the 1947 act subject to such rules and regulations as the commission may prescribe, the question that then arises is whether that operation is the exercise of a governmental or of a proprietary function on the part of the State. This question has been thoroughly examined by counsel with the result that it seems clear that the weight of authority in other jurisdictions is to the effect that the operation of airports is usually the exercise of a proprietary function. Authorities along this line will be found well collected in *Rhodes* v. *City of Asheville,* 230 N. C. 134, 52 S. E. 2d 371, decided March 23, 1949. With us, however, the 1947 act contains the following section:

"Sec. 10. The acquisition of any lands or interests therein pursuant to this act, the planning, acquisition, establishment, construction, improvement, maintenance and operation of airports and air navigation facilities, whether by the state separately or jointly with any municipalities, and the exercise of any other powers herein granted to the commission are hereby declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity. All lands and other property and privileges acquired and used by or on behalf of the state in the manner and for the purposes enumerated in this act shall and are hereby declared to be acquired and used for public and governmental purposes and as a matter of public necessity."

Hence, in the absence of a showing of arbitrariness, the power of the Legislature to delegate the immunity of the State from litigation to different agencies and units of government and to declare what is and what is not the exercise of a governmental function is complete (124 A. L. R. 350; *Watts* v. *State Road Commission,* 117 W. Va. 398, 185 S. E. 570) and we are obliged to hold that the City of Morgantown was operating the airport here involved together with The West Virginia State Aeronautics Commission and subject to the paramount control of that body, and that therefore the State's immunity under Section 35 of Article VI of our Constitution extends to this activity of the City of Morgantown as constituting a subdivision of the State's sovereignty.

It is argued that the rental of hangar space is in its nature proprietary and under no circumstances a governmental function. If we considered ourselves at liberty to decide this case under what may be termed the common-law principle distinguishing between proprietary and governmental functions, we would feel impelled to agree. Instead, however, we are here confronted with Chapters 11 [Code (Michie, 1947 Supp.) 8-11-1-8] and 12 of the Act of 1947 dealing with the same subject matter and Chapter 11 expressly providing that its use of terms or phrases shall be construed in the manner terms and phrases are expressly defined in Chapter 12. We are therefore of the opinion that the two chapters should be read *in pari materia.* Section 6 of Chapter 11 provides expressly that the rental of hangar space "or any other facilities" shall in no way be prevented by the terms of the act. Section 10 of Chapter 12 makes the "operation of airports and air navigation facilities, * * *" the exercise of a governmental function. Plainly, Chapter 11 specifies the rental of hangar space as an incidental facility in the operation of an airport and just as plainly Chapter 12 fixes the performance of undertakings of that nature in the category of governmental functions. Coupled with what we believe to be the express intention of the Legislature is considered what we believe is the common

understanding and custom that the rental of hangars is usually a part of the operation of an airport and we believe that the conclusion is unavoidable that in this instance the rental of hangar space by the City of Morgantown was, under the terms of the statutes referred to, the exercise of a governmental function. We fully realize that considered segregated from the general legislative purpose of encouraging and promoting the development of aviation in West Virginia and viewed alone, it would seem a far cry to say that the rental by the City of Morgantown to L. J. Van Gilder of space for his airplane for fifteen dollars per month amounts to the exercise of its sovereignty by the State of West Virginia. When we consider that liability in connection with the operation of an airport might result in the obliteration financially of many of our smaller cities and that that fact would prevent other small cities from embarking upon an enterprise in which the public good is involved, the fact that the development of aviation had prompted the Legislature to extend the State's immunity becomes more apparent. This case could impair the financial existence of the City of Morgantown if based upon a general catastrophe. Fortunately it does not. The principle is the same.

For the foregoing reasons our reply to the certified questions is: (1) The declaration does state a good cause of action for the breach of a contract of bailment for hire; (2) improperly propounded and hence not answered; (3) the Morgantown Municipal Airport, as shown by the allegations of defendant's Special Plea and Statement of Defense No. 1 was, at the date of the injury complained of, being operated by the City of Morgantown in the performance of a governmental function under the provisions of Section 10 of Chapter 12 of the Acts of 1947 and therefore the immunity of the State of West Virginia from being made a defendant in any court of law or equity covers its conduct in such operation.

The case will be remanded with the questions so answered.

*Affirmed.*

HAYMOND, JUDGE, dissenting:

The conclusion reached by the majority is contrary to the clear weight of authority and is also unsound in principle. It incorrectly extends to a municipality the immunity of the State from liability and unjustly deprives the plaintiff of his clear right to compensation for the wrongful destruction of his property. I disagree with that conclusion and express my dissent.

Though there is some conflict in the decided cases in different jurisdictions, the prevailing weight of authority is that in the operation and the maintenance of an airport primarily as a commercial enterprise, a municipality exercises a proprietary rather than a governmental function. Fixel on the Law of Aviation, Third Edition, Section 198; McQuillin, Municipal Corporations, Third Edition, Vol. 18, Section 53.96; Annotations, 138 A. L. R., page 126; *Rhodes v. City of Asheville,* 230 N. C. 134, 52 S. E. 2d 371; *Mayor and City Council of City of Baltimore v. Crown Cork and Seal Company,* Fourth Circuit, 122 F. 2d 385; *Peavey v. City of Miami,* 146 Fla. 629, 1 So. 2d 614; *Coleman v. City of Oakland,* 110 Cal. App. 715, 295 P. 59; *Pignet v. City of Santa Monica,* 29 Cal. App. 2d 286, 84 P. 2d 166; *City of Blackwell v. Lee,* 178 Okla. 338, 62 P. 2d 1219; *Christopher v. City of El Paso,* Texas Civil Appeals, 98 S. W. 2d 394; *Mollencop v. City of Salem,* 139 Or. 137, 8 P. 2d 783, 83 A. L. R. 315; *Blue v. City of Union,* 159 Or. 5, 75 P. 2d 977; *City of Mobile v. Lartigue,* 23 Ala. App. 479, 127 So. 257; *McLaughlin v. City of Chattanooga,* 180 Tenn. 638, 177 S. W. 2d 823. On this point the statement in 6 Am. Jur., (Rev. Ed.), Aviation, Section 37, is in this language: "The weight of authority is to the effect that where a municipality or other public authority maintains and operates an airport primarily or mainly as a commercial or revenue-producing enterprise, it acts in a proprietary, as distinguished from a governmental, capacity, and is subject to tort liability in connection therewith, in the absence of any statutory provision to the contrary." The contrary and minority view is recognized and adhered to in some jurisdictions, among them Iowa and Georgia. *Abbott v.*

*City of Des Moines,* 230 Ia. 494, 298 N. W. 649, 138 A. L. R. 120; *Mayor of Savannah* v. *Lyons,* 54 Ga. App. 661, 189 S. E. 63.

In the *Abbott* case, the Supreme Court of Iowa, under a statute which expressly provided that the liability of a municipality in connection with an airport should be no greater than that imposed upon the municipality in the operation of its public parks which by the law of that State is a governmental function, held that the operation of an airport by a municipal corporation constitutes a governmental, rather than a proprietary, function, and that the municipality was exempt from liability for an injury to an airplane caused by the negligence of its employee while repairing a tower of the airport. In the *Mayor of Savannah* case, the Court of Appeals of Georgia held that a statute, which declared that any lands acquired, owned, leased, controlled, or occupied by counties, municipalities, or other political subdivisions for the purpose of operating and maintaining airports were devoted to public, governmental and municipal purposes, invested such airports with the character of governmental institutions.

In the leading and well considered case of *Rhodes* v. *City of Asheville,* 230 N. C. 134, 52 S. E. 2d 371, which recognizes and follows the rule supported by the weight of authority, the Supreme Court of North Carolina held that a statute which closely resembles and is substantially similar to the provisions of Section 10 of Chapter 12, Acts of the Legislature, 1947, Regular Session, and which declared that the construction, the maintenance and the operation of an airport by a municipality were "public, governmental and municipal functions exercised for a public purpose and matters of public necessity", did not relieve a municipality from liability for an injury caused by the tortious act of its employee in connection with the maintenance and the operation of its airport, and that, despite the above quoted provisions of the statute, the maintenance and the operation of its airport were proprietary and not governmental functions. With respect to

the effect of an enterprise engaged in by a municipality for a public purpose the court said:

"A municipal corporation cannot legally engage in any enterprise in its governmental or proprietary capacity which does not come within the meaning or definition of a public purpose. *Nash v. Tarboro*, 227 N. C. 283, 42 S. E. 2d 209.

"And even though a municipal activity has been held to be for a public purpose, we may still have difficulty in determining whether such activity is a corporate or proprietary function, and is therefore subject to suits in tort, or a governmental function and immune from such suits."

After citing numerous cases and discussing several decisions of the courts in other jurisdictions the opinion in the *Rhodes* case contains these statements:

"We have found no decision, and the appellants have cited none, in which any Court of last resort in this country, has held that the construction, operation and maintenance of an airport by a municipality is a governmental function and that municipalities may not be held liable in tort for the negligent operation thereof, except where they have been expressly exempted from such liability by statute.

"The interpretation we place on the language of the statute upon which the defendants are relying for immunity, leads to the view that it was the intent of the Legislature to declare that the acquisition, construction, operation and maintenance of an airport by a municipality was a governmental function in the sense that it was a public purpose. Note the language of the statute: 'The acquisition, establishment, construction, maintenance * * * and the exercise of any other powers herein granted to municipalities are hereby *declared to be public, governmental and municipal functions exercised for a public purpose* and matters of public necessity.'

"In the light of our own decisions and the other authorities cited herein, we are of opinion that our General

Assembly did not exempt municipalities from tort liability in connection with the ownership and operation of airports by the enactment of G. S. 63-50, and we so hold."

In the opinion the court also uses this pertinent language:

"It might be wise to exempt municipalities from tort liability in connection with the construction, operation and maintenance of airports, if so, we think the exemption should be expressly granted by the Legislature, rather than by judicial decree. Airports are here to stay and will be used extensively by the public in the future. However, transportation by air has not been developed to a point so as to make the construction, operation and maintenance of the average airport a profitable enterprise. That is why private capital is not available for this purpose.

"But until the General Assembly expressly exempts municipalities from tort liability in connection with the operation of airports, they may be held liable for negligent operation to the same extent as they are now liable for negligence in connection with the construction, operation and maintenance of light plants, water works, wharves, and other corporate functions. The function of an airport is to maintain facilities for the use of the ships of the air, just as port terminals or wharves are maintained for the use of the ships of the sea."

In the well reasoned case of *Peavey* v. *City of Miami*, 146 Fla. 629, 1 So. 2d 614, the Supreme Court of Florida held that a municipality was liable for personal injuries to an aviator and for damages to an airplane which were caused by a collision between the airplane and road machinery left on a runway without proper warning or signals. In the opinion the court said: "The weight of judicial authority seems to hold the operation of an airdrome by a municipality to be a 'proprietary' function as distinguished from a 'governmental' function * * *. That is, this is true where the municipality does

not devote the airport exclusively to municipal or governmental purposes, but undertakes to conduct an enterprise of a commercial character from which it seeks to derive revenue. * * *. Consequently, the city, in the case at bar, was required to exercise the same degree of care in the maintenance of its property as is imposed upon others who undertake to render services or furnish accommodations to the public. That is, 'the law imposes a duty to use proper care, precaution, and diligence in providing and maintaining the accommodations in a reasonably safe condition for the purposes to which they are adapted, and are apparently designed to be used. * * *.' Therefore, it was the duty of the defendant to see that the airport was safe for aircraft and to give proper warning of any danger of which it knew or ought to have known; and the defendant had the 'duty to keep the runways free from obstructions, so far as possible, or to place markers warning pilots of danger.' 6 Am. Jur., 11 Aviation, Sec. 14."

In my judgment the above quotations from the opinion in the *Peavey* case directly apply to the facts disclosed by the pleadings in the case at bar. Under the cited decisions which constitute the decided weight of judicial authority the operation and the maintenance of an airport by a municipality, when not exclusively devoted to its actual governmental activities or uses, are a proprietary or corporate function and not a governmental function. The storage by the defendant, the City of Morgantown, in one of the hangars used in connection with its airport, of the airplane of the plaintiff at the monthly rental of fifteen dollars, constituted a bailment for the mutual benefit of the parties and was, in fact and in law, a purely commercial transaction.

Section 10, Chapter 12, Acts of the Legislature, 1947, Regular Session, merely declares that the operation and the maintenance of "airports and air navigation facilities, whether by the state separately or jointly with any municipalities," and that the exercise of any other powers granted to The West Virginia State Aeronautics Commis-

sion, are public and governmental functions, exercised for a public purpose, and matters of public necessity, but does not expressly exempt municipalities from liability for injuries caused by their acts. To hold, under that section, that a municipality is immune from such liability, creates a dangerous and unjust innovation in the law contrary to well established legal principles in this State and in other jurisdictions which will inevitably place a premium upon the destructive carelessness of its agents and employees and deprive every member of the public, using the facilities of or lawfully present at a municipally operated airport, of any right of redress against the municipality for any injury caused by its negligence or other wrongful acts. There is no justification in reason, law, or justice, for a judicial grant of any immunity of that character; and, in my opinion, the statute just referred to and quoted in its pertinent provisions, upon which the decision of the majority rests, furnishes no sufficient basis for any such result.

Examination of the authorities discloses that the court of last resort in at least two jurisdictions recognizes and enforces liability of a municipality in favor of the owner of an airplane destroyed by fire caused by the negligence of the municipality while the airplane was stored in a hangar of a municipally operated airport rented by the city to the owner of the airplane for that purpose. *Godfrey* v. *City of Flint,* 284 Mich. 291, 279 N. W. 516; *City of Blackwell* v. *Lee,* 178 Okla. 338, 62 P. 2d 1219.

In the *Godfrey* case, the plaintiff leased his airplane to an employee of the municipality who was in charge of the operation of its airport. This employee was engaged by the city to manage the airport and perform certain services for which he was paid fifty dollars per month and given the right to use the flying field for commercial flying and a hangar for the storage of the airplane. After this arrangement was entered into, the municipality received aid from the federal government for the improvement of the airport and the employee was transferred to the payroll of a federal agency but he continued to per-

form the same services in the management of the airport. Following this change in his original employment, the airplane of the plaintiff was destroyed by fire caused by the negligence of mechanics employed by the city. The jury rendered a verdict for the plaintiff, but the trial court, on motion of the defendant, entered judgment notwithstanding the verdict. In reversing the action of the trial court the Supreme Court of Michigan held that the foregoing facts were sufficient to require the trial court to submit to the jury the question of the existence of a bailment between the lessee of the plaintiff and the city for the mutual benefit of both parties. In the opinion the court used this language:

"The degree of care required where the bailment is for the benefit of both parties is well stated in *Hofer* v. *Hodge*, 52 Mich. 372, (50 Am. Rep. 256, 1 Am. Neg. Cas. 661), where we said: 'The bailment being beneficial to both parties the duty of the defendant in keeping the property was substantially the same as a bailment for hire. He was bound to keep and preserve the property with ordinary care—that care which a prudent man ordinarily takes of his own property.'

"And in *Fraam* v. *Railway Co.,* supra, where we said: 'The contract of bailment here under consideration is one for the mutual benefit of the parties, and the bailee thereunder was bound to exercise ordinary care of the subject-matter of the bailment, and is liable for ordinary negligence. Ordinary care means such care as ordinarily prudent men, as a class, would exercise in caring for their own property under the like circumstances, and whether it is exercised or not is a question of fact for the determination of the jury, under proper instructions.'" Though the court does not discuss the question whether the operation of the airport is a governmental or a proprietary function, it is manifest that it regarded such operation as the exercise of a proprietary, and not a governmental, function.

In the *City of Blackwell* case the Supreme Court of

Oklahoma held that the city had the authority to operate its airport for the advantage and the benefit of its citizens, there being no statutory provision to the contrary, that in so operating it the municipality did not act in a governmental capacity, and that in such operation it was liable for the negligence of its servants which resulted in the loss or the damage by fire of the airplane of the plaintiff the same as a private person in similar circumstances.

These decisions of courts of recognized standing are persuasive though not binding authority and in my opinion should control the decision in this case and permit the plaintiff to recover damages from the City of Morgantown, the sole defendant in this action, for the destruction of his airplane, caused by the negligence of its employees, while it was in the custody of the city as a bailee for hire.

The different nature of the various functions exercised by a municipal corporation is discussed in a treatise of recognized standing in these words: "While municipal corporations are primarily incorporated as political subdivisions of the state for the purpose of performing local governmental functions in the interest of the public order, health, safety, and welfare, it is frequently stated that every municipal corporation has a two-fold character, or two classes of powers of which one is political, governmental, legislative, or public, while the other is variously designated as private, proprietary, municipal, or ministerial, sometimes referred to as quasi-private. In its governmental or public character, the corporation is made, by the state, one of its instruments, or the local depository of certain limited and prescribed political powers, to be exercised for the public good in behalf of the state rather than for itself. But in its proprietary or private character, the theory is that the powers are supposed not to be conferred primarily or chiefly from considerations connected with the government of the state at large, but for the private advantage of the compact community which is incorporated as a distinct legal personality or

corporate individual; and as to such powers, and to property acquired and contracts made thereunder, the corporation is frequently regarded as having the rights and obligations of a private, rather than those of a public, corporation. It may have property rights which are not held at the pleasure of the legislature, and may claim them even as against the sovereign. The governmental functions of a municipal corporation are those conferred or imposed upon it as a local agency, to be exercised not only in the interest of its inhabitants, but also in the advancement of the public good or welfare as affecting the public generally. They include the promotion of peace, health, safety, and morals, as well as the expenditure of money, particularly relating to public improvements, the expense of which ultimately is borne by the property owners. The distinction between acts in the performance of a governmental function and those in the performance of a corporate or proprietary function is that in the case of the former, the municipal corporation is executing the legislative mandate with respect to a public duty generally, while in the other, it is exercising its private rights as a corporate body. The municipal corporation is to be regarded as a private company as to powers granted to it for purposes of private advantages and emoluments, even though the public may derive a common benefit therefrom. It should be noted that the word 'private' is used in connection with this subject in a relative sense, to signify functions which are not governmental and which are sometimes undertaken by corporations only quasi-public; a municipality cannot be constitutionally authorized to undertake any functions which are really private. All functions of a municipal corporation not governmental are said to be municipal. The basis of the distinction is difficult to state, and there is no established rule for the determination of what belongs to one class or the other. The governmental functions and the corporate business activities of a municipal corporation are, however, held to be quite different, and each class of such charter powers regulated by distinct principles and pro-

visions of law." 37 Am. Jur., Municipal Corporations, Section 114.

That a municipality may act in a dual capacity with respect to proprietary and governmental functions is firmly established by the decisions of this Court. *Warden* v. *City of Grafton*, 99 W. Va. 249, 128 S. E. 375, 42 A. L. R. 259; *Wigal* v. *City of Parkersburg*, 74 W. Va. 25, 81 S. E. 554, 52 L. R. A., N. S., 465; *Gibson* v. *City of Huntington*, 38 W. Va. 177, 18 S. E. 447, 22 L. R. A. 561, 45 Am. St. Rep. 853.

In the *Warden* case, in discussing the question of the liability of a municipality for its tortious acts, this Court said: "The general rule denying liability of municipal corporations for torts, is doubtless based on an analogy to the nonliability of the state for torts. And this rule is admittedly correct where the municipal corporation is engaged in performing strictly governmental functions corresponding to those performed by the state. But cities, being a more adaptable unit for the purpose, have in recent years entered into the economic life of its citizens, in many ways, and have undertaken enterprises formerly conducted by individuals or private corporations, often enterprises not essential to good government, but which are more in the nature of conveniences and places of amusement and recreation. Being based on analogy, it is obvious that the general rule is to be applied to municipalities only where their functions are similar to those of the state. It is true, the state delegates certain of its functions to be administered by cities and towns, because of the facility with which they can cope with local conditions and better serve the welfare of the citizens of the state residing within their jurisdiction. Almost universally the police, school, health, and fire departments are classed as governmental; while municipally owned water works, gas and electric plants, and street railways are recognized as proprietary." In that case this Court held that it is the duty of a city owning and operating a public park under authority granted by its charter, to exercise ordinary care in the construction and the maintenance of

mechanical apparatus erected for the amusement and the recreation of the public using such park; and that for a breach of such duty the city is liable in damages to a person injured while using such appliance for the purpose for which it was intended. That the operation and the maintenance of an airport by a municipality is not an essential municipal function or expense is also established by respectable judicial authority. *Rhodes* v. *City of Asheville*, 230 N. C. 134, 52 S. E. 2d 371; *Sing* v. *City of Charlotte*, 213 N. C. 60, 195 S. E. 271.

In *Wigal* v. *City of Parkersburg*, 74 W. Va. 25, 81 S. E. 554, 52 L. R. A., N. S., 465, in discussing the same subject, this Court, in holding the city liable for its negligent acts in the operation of a municipal water works system used this language: "Municipalities supplying their inhabitants with water do not maintain separate waterworks for fire protection; water for both purposes is invariably supplied through the same mains. Neither do they undertake to supply water for domestic use without at the same time providing fire protection. So that, in every case dealing with the subject of municipal liability respecting the maintenance of waterworks, it may fairly be assumed that the plant was serving a dual purpose; and the rule is that, unless the negligence complained of is the work of extinguishing fires, the municipality is liable on the same principle that a corporation engaged in the same business is liable. 'The fact that the city may also use the waterworks for protection against fire does not relieve it from liability for negligent acts of its servants or agents in the conduct of the business, except for such acts as are performed by them in the actual work incident to extinguishing fires.' *Piper* v. *City of Madison*, 140 Wis. 311. *City of Winona* v. *Botzet*, 169 Fed. 321. Municipal liability for negligence depends upon whether the negligence was in performing a governmental or non-governmental service; if the former it is not liable, otherwise it is liable. * * *. But the business of supplying its inhabitants with material necessities and comforts, such as water, light and street railway service, is not govern-

mental, and yet a municipality may engage in such business when authorized by its charter to do so, or it may authorize it to be done by a private corporation. But when it assumes such duties, its liability for negligence in the performance thereof is the same as that of a private corporation engaging in a similar business. * * *. Discussing municipal ownership of public utilities, McQuillin, in his work on Municipal Corporations, Vol. 6 Sec. 2680, says: 'Municipal ownership, in the usual and common acceptation of that term, must of necessity carry with it the same duty, responsibility and liability on account of negligence that is imposed upon and attaches to private owners of similar enterprises. For example, it is settled beyond dispute that a municipality which operates its own water, electric light, or gas plant acts in a private and not a governmental capacity and is liable for its negligence in connection therewith.' ". The opinion then mentions many particular instances in which, in the operation of a municipal water works, the municipality is held liable for the consequences of its negligence.

By every recognized standard, in law, in fact and in reason, the rental, for hire, by the defendant, the City of Morgantown, of a hangar at its airport, for the storage of the airplane of the plaintiff, is a proprietary, commercial or corporate function, and the operation of the airport by the city is simply and actually its operation of a public utility which is in nowise distinguishable from its operation of a street railway or of a ferry for the transportation of freight and passengers, each of which services is widely recognized as a proprietary or corporate function. In the operation of a public utility it is generally held that a municipal corporation acts in a proprietary rather than a governmental capacity. 37 Am. Jur., Municipal Corporation, Section 115; McQuillin, Municipal Corporations, Third Edition, Vol. 18, Sections 53.90, 53.109, 53.110 and 53.111. A municipality which by means of its power plants and water works sells light, power, heat and water for private purposes acts in a proprietary or business capacity and not in the exercise of a govern-

mental function. *Hyre* v. *Brown,* 102 W. Va. 505, 135 S. E. 656, 49 A. L. R. 1230.

The disastrous and intolerable consequences which logically and necessarily result from the conclusion reached and expressed in the majority opinion, that a municipality in the operation of an airport is necessarily, under the present statutes of this State, engaged in the performance of a governmental function, may be readily envisioned. If the majority means what the opinion states, it is obvious that any person dealing with a municipality engaged in the operation of an airport is without any remedy for any injury or damage caused by the municipality by any act or conduct upon its part, whether such act or conduct is tortious in character or constitutes a breach of contract. Under the reasoning of the majority, that the acts of a municipal corporation in the operation of an airport are governmental in character, a person who purchases a ticket for a flight upon an airplane operated by the municipality, whose ticket is rejected or dishonored or who, as a passenger, is negligently injured, is deprived of any remedy whatsoever against the municipality for damages which result from its breach of contract or its negligent act. For the same reason, an invitee who enters the airport of a municipality and is there negligently or intentionally injured by its employee or servant has no right to compensation or other remedy against it for the injuries so inflicted. It is difficult to believe that the Legislature, in enacting the statute, by the mere declaration that "the planning, acquisition, establishment, construction, improvement, maintenance and operation of airports and air navigation facilities, whether by the state separately or jointly with any municipalities, * * * are hereby declared to be public and governmental functions exercised for a public purpose, and matters of public necessity.", without expressly relieving a municipality of liability for the consequences of its act, intended to create or make possible the legally abnormal situations to which I have referred.

The determination of the character of acts performed

by a municipal corporation in the operation of an airport, in any given instance, is a judicial question; and whether a specific act of a municipal corporation occurs in the exercise of its proprietary or its governmental function is to be decided not by the Legislature but by the courts. Factual realities can not be changed by mere legislative fiat and any legislative declaration which is clearly contrary to the actual facts in a particular situation should not be recognized or sanctioned in a judicial proceeding. *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389; *State ex rel. Adkins* v. *Sims,* 127 W. Va. 786, 34 S. E. 2d 585, (concurring opinion); *Woodall* v. *Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A., N. S., 83, Ann. Cas. 1914B, 1278. As stated by Judge Fox in his concurring opinion in *State ex rel. Adkins* v. *Sims,* 127 W. Va. 786; 34 S. E. 2d 585: "The Legislature may not declare that a public purpose which is clearly a private one. It cannot, by its mere fiat, make black white. *Ohio Oil Co.* v. *Wright,* 386 Ill. 206, 53 N. E. 2d 966." In the *Ohio Oil Company* case the Supreme Court of Illinois said: "The legislature does not have the power by legislation to declare that not to be a fact which everyone knows is a fact (Winter v. Barrett, 352 Ill. 441, 186 N. E. 113, 89 A. L. R. 1398), and, by the same reasoning, cannot legislate that to be a fact which everyone knows is not a fact." In dealing with a statutory presumption, the Supreme Court of the United States, in *Western and Atlantic Railroad Company* v. *Henderson,* 279 U. S. 639, 49 S. Ct. 445, 73 L. Ed. 884, used this language: "A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the Fourteenth Amendment. Legislative fiat may not take the place of fact in the judicial determination of issues involving life, liberty or property."

For the reasons stated and under the authorities cited and quoted from in this opinion, I would reverse the ruling of the Circuit Court of Monongalia County.

I am authorized to say that Judge Lovins concurs in the views expressed in this dissent.